***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Ledford and the briefs and arguments of the parties. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, or rehear the parties. The Full Commission affirms the Opinion and Award of Deputy Commissioner Ledford with modifications and enters the following Opinion and Award.
 ***********
The Full Commission finds as a fact and concludes as matters of law the following, *Page 2 
which were entered into by the parties as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission, and an Employee-Employer relationship existed between the parties on May 31, 2005.
2. Employee/Plaintiff suffered an injury by accident arising out of and in the course and scope of her employment with Employer/Defendant on May 31, 2005.
3. There is no question as to the misjoinder or nonjoinder of any parties, and the parties are properly before the Industrial Commission (which has jurisdiction of the claim).
4. Employer/Defendant is insured and their workers' compensation claims are managed by AIG Risk Management, Inc.
5. The transcripts of the depositions of Dr. Peter Mangone, Dr. Tracy Pesut, and Michael Galloway, MS, CRC, were received as evidence.
6. The following documents were received via the stipulation of the parties:
 a. A Pre-Trial Agreement, which was admitted as Stipulated Exhibit 1.
 b. The parties also handed up a large indexed/paginated exhibit as Stipulated Exhibit 2, which contains I.C. Pleadings, medical records, discovery and other employment and wage information.
7. The Employee/Plaintiff contends that the issues to be addressed before the Industrial Commission are:
 a. To what additional compensation benefits is Plaintiff entitled as a result of the injuries she sustained on May 31, 2005?
8. The Defendants contend that the issues to be addressed before the Industrial Commission are: *Page 3 
 a. Whether Plaintiff has been totally disabled within the meaning of the Act at any time after February 23, 2006?
 b. Whether any of Plaintiff's medical conditions beyond her left and right foot injuries are causally related to her accident at work?
 ***********
Based upon all the competent evidence from the record, the Full Commission finds as follows:
 FINDINGS OF FACT
1. At the time of the hearing before the deputy commissioner, Plaintiff was 66 years of age and living in Knoxville, Tennessee.
2. Plaintiff's work history involves significant experience as an insurance agent. She first obtained licensure to write insurance in Florida following her graduation from high school in 1960, and she subsequently worked for various insurance agencies.
3. From 1993 to 2000, Plaintiff owned and operated her own health insurance agency in Asheville called Health Plus Insurance. Other than receiving part-time help with filing, Plaintiff handled every aspect of running Health Plus Insurance, which involved sales along with administrative, financial and operational responsibilities. In 2000, Plaintiff sold her company to another insurance agency in Asheville and stopped working for several years in order to care for her mother until she decided to re-enter the work force in 2004.
4. Plaintiff was employed by the Defendant-employer as a Coordinator for Life and Health insurance lines from September 27, 2004 through June 6, 2006. She reported to co-owners and vice-presidents, Jerry Vincent and Bill McLean. Contrary to her testimony, Plaintiff was not a sales agent. *Page 4 
5. Plaintiff's job duties as a Coordinator primarily involved preparing quotes and proposals, administrative functions for the sales force, and customer service. Plaintiff obtained quotes from various carriers and wrote proposals for coverage to present to potential insureds. She coordinated coverage by sending information to and gathering information from the company's insureds. Plaintiff was paid $17.00 per hour. Although she was not in sales, she occasionally earned a commission on new policies that she wrote.
6. The Defendant-employer's office had two floors. On May 31, 2005, while carrying a large file up the stairs, Plaintiff stumbled on the steps and fell forward on to the landing located in the stair well, injuring both feet. At first she was diagnosed with a right ankle sprain. Her complaints began to focus on the left lower extremity a few weeks later.
7. Defendants completed a Form 19 which indicated that Plaintiff was walking up the stairs with some files in her hand, when she tripped, tearing a ligament in her right ankle. The Form 19 also provided that Plaintiff's average weekly wage was $837.50. On or about October 24, 2005, American Home Assurance Company prepared and filed a Form 60 accepting the compensability of Plaintiff's claim, and showing an average weekly wage of $600 and a compensation rate of $400.
8. Plaintiff received treatment for a left ankle sprain at ProMed, by Dr. David Ward. She continued to work wearing an ASO brace prescribed by Dr. Ward. By June 20, 2005, Plaintiff was experiencing bruising and pain in the lateral aspect of the left ankle, which Dr. Ward assessed as resulting from her altered gait that Plaintiff initially experienced after her right ankle injury.
9. In July of 2005, Hutton Companies conducted annual performance reviews of all of its employees. As a result of the meeting, management agreed to move Plaintiff's office to the *Page 5 
first floor by August 1, 2005, to accommodate her ongoing problems with her foot. Also during the review process, Plaintiff suggested that the new receptionist, Ms. Dianne Offen, should be more involved in the Life and Health department by assisting Plaintiff with administrative tasks. Plaintiff wrote on her evaluation that she thought that the new receptionist should be doing spread sheets on proposals.
10. Plaintiff saw orthopedic surgeon Dr. Peter Mangone at Blue Ridge Bone and Joint on August 15, 2005. Dr. Mangone determined that Plaintiff's left foot problems originated from the left subtalar joint and irritation of the superficial peroneal nerve. He initially treated her conservatively, and tried injections for her pain.
11. On October 6, 2005, Dr. Mangone performed sinus tarsi debridement surgery. He took Plaintiff out of work at that time. Dr. Mangone's post-operative diagnosis was left sinus tarsi pain with mass in soft tissue, left peroneal tendonitis, and left superficial peroneal nerve post-traumatic arthritis. As of October 17, 2005, he placed Plaintiff into a short Cam boot and started her on physical therapy.
12. Plaintiff had planned a vacation to Europe during this time to visit with family, and Dr. Mangone did not restrict her from traveling post-surgery. At her office visit of October 17, 2005, Dr. Mangone noted that he would see her back in about three weeks "before she is slated to go to Europe apparently." Dr. Mangone noted that she could not work at that time, but hopefully could return to work after she returned from Europe.
13. Plaintiff did visit a daughter and son-in-law in Europe for a period of about three weeks during this period of November to December 2005, following her left foot surgery. At this time, a medical case manager from GENEX, Debbie Springer, RN, BBA, was assigned to Plaintiff's case. Ms. Springer noted as of November 7, 2005, that Plaintiff would be traveling to *Page 6 
Italy for two weeks to visit her daughter. Ms. Springer next heard from Plaintiff on December 16, 2005 when Plaintiff returned a call from Ms. Springer and advised that she had returned from Europe. Plaintiff reported to her physical therapist on January 9, 2006 that she had been staying with family for three weeks.
14. After the surgery, Plaintiff showed improvement in the symptoms in the sinus tarsal region addressed by the surgery. However, she developed new complaints including hypersensitivity and burning neuritic type symptoms in the lateral forefoot, and pain in the big toe, medial arch, and posterior foot. Dr. Mangone testified that he could not attribute these new symptoms to the injury in question.
15. As of January 30, 2006, Plaintiff reported to Dr. Mangone that she was much better overall compared to pre-operatively. Dr. Mangone found that Plaintiff was in no acute distress and no longer appeared to be in constant pain. Her incisions were fully healed and her ankle had a full range of motion. As of this January 30, 2006 visit, Dr. Mangone released Plaintiff to return to work at four-hour days, and to full-duty work as of February 23, 2006.
16. Defendant-employer did not have a qualified substitute to cover Plaintiff's position when she was out for surgery. When Plaintiff went out of work, consistent with prior recommendations from Plaintiff, Defendant-employer began training the receptionist, Dianne Offen, to perform customer service duties. Defendant-employer also provided for her to obtain licensure as an insurance agent to cover for Plaintiff's job duties as much as possible in Plaintiff's absence. Defendant-employer's plan was that when Plaintiff returned to work, Ms. Offen would continue as the second Coordinator in Life and Health.
17. While Plaintiff was out of work for her surgery, Defendant-employer initiated a company-wide project to convert all of the paper files to a paperless electronic system. When *Page 7 
Plaintiff returned to work in February 2006, Mr. Vincent asked Plaintiff to assist with reviewing and culling the paper files to assist with the transition to the electronic system.
18. Plaintiff testified that she perceived that her participation in the transfer of files to the electronic filing system relegated her to the status of a file clerk. However, this job was not solely assigned to Plaintiff. Each of the eleven or twelve licensed agents in the life and health department was also asked to perform the same assistance on preparing the files for the electronic transition.
19. Although Plaintiff was under the impression that Ms. Offen had taken over her job, she never raised these concerns over her job status to management. Plaintiff never mentioned to Defendant-employer that she was threatened by Ms. Offen's new status as her peer or perceived replacement, that she perceived her job title and duties had changed, or that any physical limitations were causing her difficulty performing her job.
20. Per Mr. Vincent, Plaintiff returned to the same job as a Coordinator for Life and Health insurance in February 2006. It was intended that she assist the company with training Ms. Offen, who would now work as the second Coordinator in Life and Health.
21. After returning to work, Plaintiff continued follow-up treatment with Dr. Mangone. At her visit of March 22, 2006, Plaintiff complained of persistent pain with her post-surgically developed symptoms. Plaintiff reported that her second and third toes on the left foot were starting to splay, and that she had continuing soreness and swelling in her left ankle.
22. At this March 22, 2006 visit, Dr. Mangone noted that he was not sure why she was developing issues in her forefoot. He speculated as to whether Plaintiff's splaying and symptoms could be due to local denervation from wearing a lidocaine patch. *Page 8 
23. Dr. Mangone's examination and review of Plaintiff's physical therapy notes showed that Plaintiff was progressing well as of March 22, 2006. Dr. Mangone decided to obtain a functional capacity evaluation (FCE) to determine with specificity Plaintiff's capacity to perform work duties. His only other suggestion was that it might be appropriate to refer Plaintiff to a pain management physician for assessment of whether she had low grade reflex sympathetic dystrophy (RSD), also more commonly referred to as complex regional pain syndrome (CRPS). Defendant-carrier did not approve that assessment at the time.
24. Plaintiff had previously been assigned a medical case manager through GENEX. Those services were terminated in March 2006 after Plaintiff had returned to work and it was determined that her condition was stable, and she had successfully returned to work.
25. The functional capacity evaluation was performed by a physical therapist on April 13, 2006. The therapist could compare Plaintiff's physical capacity with the physical demands of an insurance agent. The physical demands of the job were determined by the therapist's interview with Plaintiff and the description of "Insurance Agent" as defined by the Dictionary of Occupational Titles. Plaintiff reported to the therapist that she was able to return to her position at Hutton Companies and was able to modify her duties to accommodate her functional restrictions.
26. The evaluator found that Plaintiff had the capacity to work full-time at light physical demand level under the Dictionary of Occupational Titles, which is defined as occasional lifting up to 20 pounds, up to 1/3 of the day, and frequent lifting up to 10 pounds for 1/3 to 2/3 of the day, and constant lifting of negligible weight throughout the day. Plaintiff should limit crouching, squatting, stair climbing and alternate sitting and standing. Dr. Mangone *Page 9 
and Dr. Pesut agreed with the guidelines set forth in the FCE for Plaintiff's permanent work restrictions, with the exception of sitting, for which the physicians did not limit the duration.
27. The physical therapist suggested in the FCE report that Plaintiff should limit time sitting. However, as both Dr. Mangone and Dr. Pesut expressly disagreed with assigning any restrictions placing limitations on Plaintiff's capacity for sitting, the Full Commission finds that the opinions of the testifying medical doctors are determinative in identifying Plaintiff's permanent work restrictions. Plaintiff should be restricted to light physical demand or sedentary work, but is not limited in her ability to sit to twenty minutes. She is physically capable of performing work in an office environment such as an insurance agency as she did before her injury by accident.
28. On May 3, 2006, Dr. Mangone reviewed the FCE with Plaintiff, and assigned the work restrictions as outlined above. Dr. Mangone also determined that Plaintiff had reached maximum medical improvement (MMI) and assigned a ten percent permanent partial impairment rating (10% PPD) to the left lower extremity due to persistent neuritic pain and mild residual limp. Plaintiff never returned to see Dr. Mangone.
29. After her release from Dr. Mangone, Plaintiff continued working for Defendant-employer and completed work on the file transfer project around June 2006. On June 5, 2006, Plaintiff unexpectedly told Mr. McLean that she was retiring as of June 16, 2006, and that she planned to visit her son in Alaska. That same day, Mr. McLean issued a memo to all staff advising of Plaintiff's retirement and asking that they wish Plaintiff the best of luck in her future endeavors.
30. In her discovery responses, Plaintiff alleged she left her job at The Hutton Companies due to the many problems with her injured ankle. At the hearing before the deputy *Page 10 
commissioner, Plaintiff alleged she resigned because she saw herself as a filing clerk. Plaintiff did admit on cross-examination that she in fact did not leave due to her ankle pain as she alleged in her discovery responses.
31. Mr. Vincent testified that Plaintiff's sudden resignation "came as a complete surprise," and "presented a huge problem . . . because . . . she was the only person in life, accident, and health having the background, experience, knowledge, and ability to handle our 120 or so group health clients. And I . . . had real concern about our ability to service those clients once she left."
32. Having considered all of the evidence in the record, the Full Commission finds that Plaintiff's alleged reasons for resigning are not credible, and that Plaintiff's resignation from her employment with Defendant-employer on June 6, 2006 was for reasons unrelated to her compensable workers' compensation claim.
33. Following her resignation, Plaintiff decided to forego her travel plans to Alaska and instead rented a house in Florida, where she visited with friends for a couple of months on an extended vacation. Thereafter, Plaintiff agreed to move to Knoxville Tennessee in October 2006 to house sit for her daughter and son-in-law who were stationed in Europe with the military.
34. Around September 2007, after moving to Tennessee, and more than a year and four months after her last visit to a physician for treatment of her feet, Plaintiff requested additional medical care. Defendants retained Paula H. Collins, RN, CDMS, CCM, with Ability Services Network (ASN), as the nurse case manager. Ms. Collins referred Plaintiff to Dr. Tracy Pesut with Tennessee Orthopedic Clinics. By letter of September 18, 2007, Ms. Collins provided Dr. Pesut a copy of Plaintiff's medical records and a check for $250 to review the same. Thereafter, Plaintiff came under the care of Dr. Pesut. *Page 11 
35. Plaintiff began seeing Dr. Pesut on October 17, 2007. Plaintiff reported that her toes were splaying and immobile, that she had numbness throughout her foot, radiating pain, and aching pain that was worse with walking.
36. Dr. Pesut's examination revealed a mild hallux valgus deformity of the great toe with splaying between the second and third toe and clawing of the fourth and fifth toes. Plaintiff had decreased sensation along the plantar surface of her foot as well as medially in the tibial nerve distribution. Plaintiff had a positive Tinel's sign of the superficial peroneal nerve and mild swelling of the sinus tarsi region, and no swelling over the peroneal tendon. There was no redness or warmth. Plaintiff was able to toe rise and heel rise but had difficulty with flexion and extension of her toes and was unable to abduct her toes.
37. Dr. Pesut's assessment was left ankle sprain, left tibial nerve irritation, and possible chronic regional pain syndrome (CRPS). Because she suspected possible CRPS, Dr. Pesut requested an MRI of the left ankle, along with an EMG nerve conduction study on the left. Dr. Pesut limited Plaintiff's activities to light duty with lifting no objects greater than ten pounds and restricting her to sitting thirty minutes and standing thirty minutes an hour in intervals.
38. The nerve conduction studies were performed on November 1, 2007 by Dr. Pinzon, with SpineKnoxville Tennessee Orthopaedic Clinics, PC. Dr. Pinzon concluded that the studies were essentially within normal limits. He found some evidence of chronic L5-S1 lumbar radiculopathy and some very mild chronic left superficial peroneal neuropathy.
39. Dr. Pesut reviewed the studies at Plaintiff's visit of November 8, 2007 and noted that the studies were essentially normal. Dr. Pesut diagnosed Plaintiff with a left ankle sprain and left superficial nerve neuritis. Dr. Pesut started Plaintiff on Lyrica and noted that in view of *Page 12 
the negative studies, Plaintiff should start a course of physical therapy and that the key to improvement would be time and rehab.
40. Plaintiff attended physical therapy sessions throughout the first two weeks of December 2007. Plaintiff continued her course of physical therapy, which terminated on January 15, 2008.
41. Plaintiff returned to see Dr. Pesut on December 17, 2007. The Lyrica had helped some but Plaintiff reported she had numbness of her left leg up to the mid-calf area. Due to Plaintiff's ongoing complaints of symptoms suggesting nerve irritation, Dr. Pesut was concerned that something may have been missed and referred Plaintiff for evaluation by neurologist Dr. Jacqueline Crawford.
42. Plaintiff saw Dr. Crawford on January 15, 2008. At this visit, Plaintiff reported that Lidoderm patches previously prescribed by Dr. Mangone had helped with pain. Dr. Crawford noted Plaintiff has a very complex history and assessed her with left foot numbness and weakness.
43. Dr. Crawford also ordered an MRI of the lumbar spine, which was performed on February 4, 2008. The MRI showed degenerative changes at L5-S1 without any impingement at the nerve roots.
44. Plaintiff returned to Dr. Crawford on February 13, 2008 and reported that the Lidoderm patch had been helpful in reducing her neuropathic pain of the left foot. Plaintiff continued to have severe weakness of the left foot with pain in the left lateral ankle and the dorsum of the left ankle. Dr. Crawford reviewed the MRI results and did not find evidence of a nerve root impingement. She suspected Plaintiff may have a disorder of the tibial nerve in the *Page 13 
hip, thigh, or calf. Dr. Crawford anticipated a recheck of EMG nerve conduction study in April, to reassess appropriate testing at that time.
45. Plaintiff saw Dr. Crawford again on June 11, 2008. At that visit, Dr. Crawford discussed with Plaintiff the treatment for limb dystonia noting that posttraumatic limb dystonia can be treated with Botox. Plaintiff decided that the dorsiflexion of toes and foot was not as troubling for her as the dysesthesias and Dr. Crawford determined to give her a trial of Cymbalta.
46. The note of June 11, 2008 was the last note of a visit to Dr. Crawford submitted as evidence. Dr. Crawford was not deposed and there is no evidence of her opinion on the causal relationship between Plaintiff's ongoing left foot symptoms and her injury by accident, other than Dr. Crawford's comments that Plaintiff had posttraumatic limb dystonia, an indication that she related her condition to past trauma.
47. Dr. Mangone testified that shooting pain up the leg into the thigh, as Plaintiff described, would be consistent with some nerve root impingement in her back, not related to any problem in the foot. Dr. Pesut testified that walking with a limp could cause a chain reaction causing hip or back pain, but she did not specifically testify as to the causal relationship between Plaintiff's foot injury and her back condition and acknowledged that she had not made any diagnosis of Plaintiff's lumbar spine.
48. No medical expert has testified that the low back condition for which Plaintiff was treated was causally related to the compensable injury of May 31, 2005. Therefore, the evidence is insufficient to support a finding that Plaintiff's lumbar spine condition is related to her injury by accident of May 31, 2005, when she injured her feet.
49. Dr. Pesut last saw Plaintiff on September 10, 2008. Dr. Pesut placed Plaintiff at maximum medical improvement and assigned permanent impairment ratings according to the *Page 14 
AMA guidelines rather than the NC guidelines at 5.7% to the whole person and 14.25% to the lower extremity. When provided with a copy of the North Carolina Guidelines for evaluating impairment at her deposition, Dr. Pesut did not provide any additional feedback on how her evaluation of impairment would translate under the North Carolina guidelines which do not provide for a whole person rating.
50. With regard to whether Plaintiff's neuritic symptoms or CRPS was related to her original injury, Dr. Pesut testified that it is difficult to differentiate but that it could be related to the original injury if Plaintiff had that kind of regional hypersensitivity involving the nerves in the area. Dr. Pesut testified that Plaintiff's future medical treatment needs would involve ongoing utilization of neuroleptic-type medications like Lyrica or Cymbalta and physical therapy as needed.
51. With regard to whether Plaintiff's ongoing complaints with her left foot are related to her original injury by accident, although Dr. Mangone indicated some doubt, he assessed her with a ten percent permanent impairment based upon neuritic pain. He did not differentiate the parts of the foot where she was experiencing pain.
52. Dr. Pesut's testimony indicates that, considering the history of injury and the temporal development of the symptoms in the left foot, the neuritic pain complaints of the left foot are most likely related to the original injury by accident.
53. In terms of work restrictions, Dr. Pesut confirmed that Plaintiff has been capable of light duty work at all times while under her care, and agreed with Dr. Mangone's assessment that Plaintiff has been capable of light duty work since terminating treatment with his office in May 2006 through October 17, 2007. *Page 15 
54. Based upon the greater weight of the evidence the Full Commission finds as fact that Plaintiff has been capable of performing light duty work since her resignation from her employment with the Defendant-employer on June 6, 2006.
55. Plaintiff has not looked for work in any way since her resignation in June 2006. Since retiring in June 2006, Plaintiff's income has been provided by Social Security Retirement Benefits.
56. In her discovery responses, Plaintiff alleged that she has failed to look for work at any time since her resignation due to her ongoing medical problems with her ankle and foot. At the hearing, Plaintiff testified she had not looked for work because she was so busy with therapy and doctor's appointments. However, given that Plaintiff did not resume medical treatment for nearly a year and a half and only underwent physical therapy for a period of six weeks, the Full Commission does not find this explanation to be persuasive.
57. Plaintiff testified she believed she possibly could have performed her job duties at Hutton Companies if she were to prop her foot up on a chair while working, and could possibly perform those duties under those circumstances at the present time.
58. Defendants retained vocational rehabilitation expert Michael T. Galloway, MS, CRC to perform a labor market survey of Plaintiff's local job market in Knoxville, Tennessee. In preparing his report of November 20, 2008, Mr. Galloway reviewed Plaintiff's discovery responses, job description, and medical records, including the functional capacity evaluation from April 2006.
59. With respect to Plaintiff's skill set, Mr. Galloway testified that her job description from the Defendant-employer was commensurate with the work required in the insurance industry as a whole, and her history of owning an insurance agency not only exposed Plaintiff to *Page 16 
field work, accounting, and managerial activities but also enhanced her marketability and credibility as a candidate in the insurance industry. Mr. Galloway opined that Plaintiff's age would not be a barrier to finding a job in her industry given her level of expertise and experience.
60. Mr. Galloway reviewed current job listings along with labor market data over the past two years for insurance agent jobs in the Knoxville Metropolitan area. Mr. Galloway identified multiple listings for insurance agent jobs, and indicated that his extensive research demonstrated frequent and routine openings in the industry. Most of the listings providing salary information were commensurate with Plaintiff's previous earnings for the Defendant-employer.
61. Based on this review, Mr. Galloway opined that given Plaintiff's work experience, the existence of comparable employment in the local labor market, and in considering Plaintiff's residual functional capacity as demonstrated in the FCE and subsequent medical opinions, there is a strong likelihood that Plaintiff would be able to find suitable employment providing that Plaintiff makes a reasonable attempt.
62. Plaintiff is capable of performing work in a light duty capacity such as office work for an insurance agency and has vast and valuable experience in that field. Having considered all of the evidence, the Full Commission finds that Plaintiff has failed to present persuasive evidence from a medical or vocational standpoint that participating in a job search would be futile. Plaintiff has failed to meet her burden of proving she has been totally disabled at any time since she voluntarily resigned from her position with the Defendant-employer on June 6, 2006.
63. The parties submitted earnings statements for Plaintiff. For the year of 2004, from October 16, 2004 through December 31, 2004, over this ten week and six day period, Plaintiff earned a total of $8,464.69, or about $779.64 per week. From the beginning of January 2005 *Page 17 
through May 31, 2005, Plaintiff had earned $13,812.50, an average of $636.10 per week. Her total salary reflected during this period of $22,277.19, reflects an average weekly wage of $683.95, less than noted on the Form 19, but greater than Defendants noted on the Form 60.
 ***********
Based on the foregoing Stipulations and Findings of Fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On May 31, 2005, Plaintiff sustained an injury by accident arising out of and in the course and scope of her employment with the Defendant-employer, sustaining injuries to both her left and right feet. N.C. Gen. Stat. § 97-2(6).
2. As a result of her injury by accident of May 31, 2005, Plaintiff has developed chronic neuritic-type symptoms in her left foot, including chronic pain, for which ongoing medical management is reasonably necessary. Defendants are responsible for payment for all past and future medical treatment reasonably necessary to effect a cure or provide relief, including pain management and the treatment provided by Plaintiff's managing physician, Dr. Pesut. N.C. Gen. Stat. §§ 97-2(19), 97-25.
3. At the time of her injury by accident, Plaintiff had an average weekly wage $683.95, yielding a compensation rate of $455.99. N.C. Gen. Stat. § 97-2(5).
4. Plaintiff was temporarily totally disabled from October 6, 2005 through January 30, 2006. To the extent that the Defendants may have paid Plaintiff compensation for her temporary total disability based upon the erroneously calculated $600 average weekly wage and $400 compensation rate shown on the Form 60, Defendants have underpaid Plaintiff for her period of temporary total disability, while she was out for her foot surgery. Defendants owe *Page 18 
Plaintiff the difference of $55.99 per week for the period of temporary total disability which began when Dr. Mangone took her out of work for foot surgery on or about October 6, 2005 and concluded upon her return to work light duty as of February 1, 2006. N.C. Gen. Stat. § 97-29.
5. Plaintiff was temporarily partially disabled when she returned to work at four hours per day as of February 1, 2006 through February 22, 2006. To the extent that Defendants may not have paid Plaintiff compensation for temporary partial benefits from the date of her return to work part time as of February 1, 2006 until her return to full duty as of February 23, 2006, or may have paid the same at the incorrect rate, the Defendants owe Plaintiff the difference, based upon her correct compensation rate of $455.99. N.C. Gen. Stat. § 97-30.
6. Plaintiff has failed to meet her burden of proving her low back condition is causally related to her work injury of May 31, 2005.Young v. Hickory Bus. Furn.,353 N.C. 227, 538 S.E.2d 912 (2000).
7. Plaintiff has failed to prove she has been totally disabled at any time since February 23, 2006, and therefore is not entitled to any indemnity compensation for total disability after she returned to full duty work at that time or since her resignation from her job in June 2006. N.C. Gen. Stat. § 97-29; Brice v.Sheraton Inn, 137 N.C. App. 131, 527 S.E.2d 323 (2000);Russell v. Lowes Product Distribution,108 N.C. App. 762, 425 S.E.2d 454 (1993).
8. Although she has chronic pain, which requires management, Plaintiff has otherwise reached maximum medical improvement from her left foot injury and sustained a 14.25% permanent partial impairment to the left lower extremity, for which she is entitled to compensation. N.C. Gen. Stat. § 97-31(14).
 *********** *Page 19 
Based on the foregoing Stipulations, Findings of Fact, and Conclusions of Law, the Full Commission makes the following award:
 AWARD
1. Defendants shall pay any outstanding medical expenses for Plaintiff's medical treatment rendered due to her foot injuries, including all treatment rendered by Dr. Pesut.
2. Dr. Pesut is acknowledged as Plaintiff's authorized treating physician, as selected by the employer and Defendants shall pay for any ongoing medical treatment which Dr. Pesut shall recommend for reasonable pain management for Plaintiff's chronic left foot symptoms.
3. Defendants are not responsible for payment for any medical assessment or treatment rendered for Plaintiff's back, except that Defendants shall pay for the initial lumbar MRI recommended by Dr. Pesut.
4. To the extent that the Defendants may have paid Plaintiff compensation for her temporary total disability based upon the erroneously calculated $600 average weekly wage and $400 compensation rate shown on the Form 60, Defendants shall pay Plaintiff a lump sum of the difference of $55.99 per week for her period of temporary total disability from October 6, 2005 through January 30, 2006.
5. To the extent that the Defendants either have not paid or may have paid Plaintiff compensation for her temporary partial disability between February 1, 2006 and February 23, 2006, based upon the erroneously calculated $600 average weekly wage and $400 compensation rate shown on the Form 60, Defendants shall pay Plaintiff a lump sum of the compensation due based upon her average weekly wage of $683.95 per week for her period of temporary partial disability from February 1, 2006 through February 22, 2006. Compensation is to be paid based *Page 20 
upon two-thirds of the difference between Plaintiff's wages post-injury from February 1, 2006 to February 22, 2006 and her pre-injury average weekly wage of $683.95.
6. Defendants shall pay Plaintiff compensation at the rate of $455.99 per week for 20.52 weeks as compensation for her 14.25% permanent partial impairment rating to her left lower extremity, in a lump sum, subject to an attorney's fee.
7. An attorney's fee of twenty-five percent of the net compensation awarded to Plaintiff is approved for her attorney of record, and shall be deducted from the lump sum due Plaintiff and paid directly to Mr. Gary Dodd.
8. Plaintiff's claim for any benefits related to alleged injury to her back is Denied.
9. Plaintiff's claim for any additional compensation for alleged periods of disability after she resigned from her employment in June 2006 is Denied.
10. Defendants shall pay the cost, including expert witness fees of $850 to Dr. Mangone and $850 to Dr. Pesut. Defendants are also responsible for payment of all fees charged by vocational expert Michael Galloway.
This the 22nd day of February 2010.
 S/___________________ STACI T. MEYER COMMISSIONER
CONCURRING:
 S/_____________ BERNADINE S. BALLANCE COMMISSIONER *Page 21 
 S/_____________ CHRISTOPHER SCOTT COMMISSIONER *Page 1